In the Matter of **MEDCENTERS HEALTH CARE, INC. and Park Nicollet Medical Center.**

No. C4–89–1258.

Court of Appeals of Minnesota.

Jan. 23, 1990.

Review Denied March 8, 1990.

John M. Mason, David Y. Trevor, Dorsey & Whitney, Minneapolis, for relator Park Nicollet Medical Center.

Thomas L. Fabel, Lindquist & Vennum, Minneapolis, for respondent MedCenters Health Care, Inc.

Hubert H. Humphrey, III, Atty. Gen., John A. Breviu, Asst. Atty. Gen., St. Paul, for respondent Dept. of Health.

Heard, considered and decided by GARDEBRING, P.J., and FOLEY and RANDALL, JJ.

## OPINION

FOLEY, Judge.

Relator Park Nicollet Medical Center obtained a writ of certiorari to review a decision by the Commissioner of Health. Park Nicollet claims the Commissioner's decision is precluded by prior arbitration and appeal to this court. Park Nicollet also claims the Commissioner's decision is unsupported by substantial evidence and affected by procedural and legal errors. We disagree and affirm.

## FACTS

Respondent MedCenters Health Care, Inc. is a Minnesota nonprofit health maintenance organization. MedCenters was established in 1972 by the predecessor to Park Nicollet. Park Nicollet is MedCenters' largest and most important provider.

Park Nicollet receives compensation for its services to MedCenters members pursuant to the terms of a "Provider Agreement" approved by the Commissioner. The compensation Park Nicollet receives from MedCenters for each member is called the "capitation rate."

In September 1986, Park Nicollet and MedCenters executed a new eight-year Provider Agreement. Article IV of that agreement provided in part:

*Determination and Allocation of Plan Capitation.*

[Park Nicollet] capitation allocations shall be made annually based on the actuarial projections used in setting premiums, subjected to the review and prior approval of [Park Nicollet]. To the extent that market conditions restrict the premium structure to less than the full cost as actuarilly [sic] determined, adjustments in the capitation allocation shall require prior approval of [Park Nicollet]. Any approval by [Park Nicollet] contemplated in this Article IV shall not be unreasonably withheld or delayed.

In the summer of 1987, Park Nicollet and MedCenters began negotiating the capitation rate for 1988. This was the first time the terms of the new Provider Agreement were applied. The parties failed to agree on the capitation rate for 1988; MedCenters proposed an average increase of 13% per patient, while Park Nicollet proposed an increase of 23%. When the negotiations failed, Park Nicollet and MedCenters submitted the matter to an arbitration panel, pursuant to the terms of the Provider Agreement. The Respondent Department of Health was not a party to the arbitration proceedings.

The arbitrators issued an order on January 21, 1988, interpreting the meaning of Article IV. The arbitrators found that the term "cost" as used in Article IV of the Provider Agreement was ambiguous, since each of the parties believed the term "costs" meant its own costs.

The panel concluded that the 1988 capitation rate should be based upon Park Nicollet's reasonably anticipated costs of provid-

ing medical services to MedCenters' members. The arbitration panel considered Park Nicollet's projections and calculated the 1988 capitation rate accordingly.

Although the arbitrators concluded the term "costs" was intended to mean Park Nicollet's costs, the arbitrators explained that "by implementing reasonable management practices, [Park Nicollet's] expenses in certain areas should be less than previously experienced." The arbitrators set the 1988 capitation rate at an increase of 18%—midway between the parties' proposals.

The arbitrators' decision was issued on January 21, 1988. On January 29, 1988, the Commissioner issued a cease and desist order, prohibiting MedCenters from implementing the arbitration award or making any payments to Park Nicollet exceeding 1987 levels of reimbursement without first obtaining approval from the Department of Health. In her findings, the Commissioner stated:

8. MedCenters has experienced net financial losses in 1986 and 1987. * * * In addition, MedCenters' working capital is substantially below the requirements for HMOs set forth in Minn. Rule 4685.-0600.

\* \* \* \* \* \*

10. * * * It is probable that implementation of the award will cause Med-Centers to lose substantial amounts of money and will reduce MedCenters' net worth to negative $1.4 million.

11. It is not possible for MedCenters to make the increased physician payments through premium increases in new and renewing enrollee contracts in the remainder of 1988.

\* \* \* \* \* \*

15. Minn.Stat. § 62D.19 prohibits an HMO from incurring an unreasonable expense. Implementation of the arbitrator's award would constitute an unreasonable expense for MedCenters in that:

a) It would seriously jeopardize the financial solvency of MedCenters;

b) It would result in MedCenters paying physician expenses which are sub-

stantially higher than other HMOs for similar services;

c) It would jeopardize the non-profit purposes of MedCenters in favor of the economic interests of a major participating entity.

The Commissioner's order indicated that MedCenters could request a contested case hearing as provided by statute. However, because the Commissioner's order was to its advantage, MedCenters did not challenge the cease and desist order or request a contested case hearing. Instead, on March 9, 1988, MedCenters brought a motion in Hennepin County District Court to vacate the arbitrators' decision. Park Nicollet thereupon moved the district court to confirm the arbitrators' award.

Prior to the court's decision on the parties' motions, the Commissioner issued a notice of prehearing conference and hearing, setting a contested case hearing to determine whether the terms of her order prohibiting implementation of the arbitration award should be made permanent.

On April 20, 1988, the district court issued an order confirming the arbitration order. The district court specifically noted:

The fact that there is a public policy question associated with the capitation rates prescribed by the arbitration award does not negate the validity of the process or of the award. Similarly, the fact that the Commissioner of Health has opted to inquire into the capitation rates as a matter of public policy is independent of the arbitration hearing process. * * *

Adequate procedures are available for administrative review of any public policy questions associated with the arbitration award and for judicial review of any questions of law associated with this decision or the arbitration process.

MedCenters appealed the district court's decision to this court, which issued an opinion affirming the district court decision to confirm the arbitrators' award. *MedCenters Health Care, Inc. v. Park Nicollet Medical Center*, 430 N.W.2d 668 (Minn.Ct. App.1988), *pet. for rev. denied* (Minn. April 26, 1989).

During the pendency of the appeal, an administrative law judge conducted a contested case hearing. On December 21, 1988, the ALJ issued his report and recommendation to the Commissioner, concluding that the arbitrators' award was not binding since it constituted an unreasonable expense and jeopardized MedCenters' solvency. In a memorandum, the ALJ rejected Park Nicollet's argument that the Commissioner was attempting to overturn this court's decision:

> In this proceeding the Commissioner is not reviewing the rights of [Park Nicollet] or [MedCenters] under the provider agreement and she is not reviewing the arbitrators' decision construing that agreement and establishing rates pursuant to the agreement. On the contrary, the Commissioner is exercising her independent statutory authority to issue a Cease and Desist Order requiring the HMO not to pay an unreasonably high expense. Her decision does not involve the same issues the arbitration panel, the District Court or the Court of Appeals decided.

The ALJ concluded that the capitation rates set by the arbitrators were unreasonably high in relation to the value of services provided by Park Nicollet because Park Nicollet had been providing unnecessary services to MedCenters patients. The ALJ found that bookings per encounter for plan members exceeded those of fee-for-service patients.

On May 15, 1989, the Commissioner adopted the ALJ's recommendation. The Commissioner found that the excess bookings differential occurred for the following reasons:

> First, unnecessary services have been provided to [MedCenters] members. Second, [Park Nicollet] has charged [MedCenters] more than fee-for-service patients are charged for certain procedures. * * * Finally, upward "creep" in physician charging practices has occurred as a result of [Park Nicollet]'s compensation system.

The Commissioner made her cease and desist order permanent, noting that because the arbitrators' order could not be enforced the parties must resort to further arbitration to determine reasonable capitation rates for 1988.

The Commissioner denied requests for reconsideration, and Park Nicollet obtained a writ of certiorari, seeking review of the Commissioner's May 15, 1989 order and her denial of reconsideration.

## ISSUES

1. Did the Commissioner exceed her statutory authority by instituting contested case proceedings?

2. Did the Commissioner have the authority to determine that the terms of the arbitration order were unreasonable and violative of Minn.Stat. § 62D.19 (1988) after the order had been confirmed by the district and appellate courts?

3. Are the Commissioner's findings supported by the record?

4. Did the Commissioner err by retroactively setting rates?

## ANALYSIS

1. Park Nicollet claims the Commissioner exceeded her statutory authority by instituting contested case proceedings on her own initiative. We disagree.

■ Minn.Stat. § 62D.17, subd. 4 (1988) authorizes the Commissioner to issue a cease and desist order when an HMO violates the provisions of the HMO Act. One provision of the act prohibits HMOs from incurring or paying any expense which is "unreasonably high in relation to the value of the service or goods provided". Minn. Stat. § 62D.19 (1988). Here, the Commissioner issued her cease and desist order because she believed the arbitration order required MedCenters to pay unreasonably high capitation rates, in violation of section 62D.19.

The HMO Act does not expressly give the Commissioner the right to initiate a contested case hearing sua sponte to enforce a cease and desist order. However, the Commissioner must have the necessary

authority to carry out her clear statutory powers:

Upon a finding by the commissioner of health * * * that a health maintenance organization is incurring or paying for any expense that is unreasonably high in relation to the value of the service or goods provided, the commissioner of health may:

\* \* \* \* \* \*

C. exercise such other statutory power as is available to him and that he deems appropriate.

Minn.R. 2730.0600 (1989). Accordingly, we believe in this instance the Commissioner had the right to initiate the contested case hearing.

2. Park Nicollet claims the Commissioner lacked the authority to issue an order prohibiting implementation of the arbitrators' order. As support for this claim, Park Nicollet raises theories of separation of powers, collateral estoppel and res judicata.

### A. Separation of Powers

■ Park Nicollet first argues the Commissioner's order constitutes an intolerable interference with the judiciary's authority to enforce its judgments. *See* Minn. Const. art. III, § 1. While it is true that an administrative agency has no authority to undermine or overrule the authority of the judiciary, we believe the decision rendered by the Commissioner here was within her separate authority to supervise the reasonableness of the rates established by MedCenters and Park Nicollet. This authority to determine whether the rates were unreasonably high is established by Minn.Stat. § 62D.19.

The Commissioner found the 1988 capitation rates unreasonable on public policy grounds. The arbitrators did not, and indeed could not, exercise this same power. The arbitrators, rather, were limited to determining whether the rates were reasonable within the meaning and under the terms of the contract.

The Commissioner's authority to supervise rates between HMOs and medical providers must of necessity be given priority over the arbitrator's decision. The prior opinion of this court is distinguishable and not binding here. In that opinion, we specifically stated:

We * * * conclud[e] that the public policy doctrine has no application to this arbitration * * *.

*MedCenters*, 430 N.W.2d at 670. Any subsequent discussion in that opinion concerning public policy was unnecessary to the decision and is therefore dicta.

It is in this opinion that we concern ourselves with public policy issues because in this case, not the appeal from the arbitrators' decision, public policy is essential to the decision. Thus, we concur with the district court's statements concerning the role of the Commissioner:

[T]he fact that the Commissioner of Health has opted to inquire into the capitation rates as a matter of public policy is independent of the arbitration hearing process.

### B. Collateral Estoppel

■ Park Nicollet cites *Ellis v. Minneapolis Commission on Civil Rights*, 319 N.W.2d 702 (Minn.1982) as authority for its argument that the Commissioner was collaterally estopped from determining the reasonableness of the 1988 capitation rates by reason of the prior arbitration and subsequent appeals.

In *Ellis*, a tenant had unsuccessfully argued in unlawful detainer proceedings that his eviction was racially discriminatory. The tenant had thereafter pursued his claim of racial discrimination in administrative proceedings. The *Ellis* court determined that the tenant was collaterally estopped from relitigating the issue of discrimination, which had already been determined in the unlawful detainer proceedings. The *Ellis* court stated:

Collateral estoppel precludes the relitigation of issues which are both identical to those issues already litigated by the parties in a prior action and necessary and essential to the resulting judgment.

*Id.* at 704.

As explained above, the policy issues addressed by the Commissioner and the is-

sues addressed by the arbitrators are not identical. The issue whether the 1988 capitation rates were reasonable in terms of public policy was unnecessary to the decision rendered by the arbitrators.

The *Ellis* court also indicated that the "application of collateral estoppel is appropriate where * * * 'the estopped party was a party or in privity with a party to the prior adjudication.'" *Id.* (quoting *Victory Highway Village, Inc. v. Weaver,* 480 F.Supp. 71, 74 (D.Minn.1979)). It was not the role of the Commissioner to participate as a party in the arbitration hearing. The Commissioner's role is to supervise the reasonableness of the rates in terms of public policy. She cannot be ordered in as an indispensable party to ascertain what the parties intended by their use of certain terms in their contract and how the capitation rates were to be calculated.

We also note Park Nicollet's argument that the Commissioner was equitably estopped from disapproving the 1988 capitation rates since she had initially approved the Provider Agreement at the time it was signed. As the ALJ found, however, it is unclear whether the entire agreement was submitted for approval. Further, the depth of the Department's review of that document is unknown. More importantly, however, we believe that by initially approving the Provider Agreement, the Commissioner merely approved a process. That initial approval did not and could not preclude her from exercising her authority under the HMO act to determine that Park Nicollet's rates were unreasonably high in relation to the services rendered.

C. Res Judicata

■ Park Nicollet finally argues the Commissioner was barred by res judicata from prohibiting payment of the capitation rates established by the arbitrators. Res judicata is applicable when there has been a final judgment on the merits, the same cause of action is involved, and the parties are identical. *Beutz v. A.O. Smith Harvestore Products, Inc.,* 416 N.W.2d 482, 484 (Minn.Ct.App.1987), *aff'd and remanded,* 431 N.W.2d 528 (Minn.1988). As we have

noted above, the parties in the arbitration and contested case proceedings were not identical; the Department was not a party or in privity with a party to the arbitration proceedings.

■ In addition, the cause of action in each of the two proceedings was not the same. One test for determining whether the same cause of action is involved is whether the same evidence will sustain both actions. *McMenomy v. Ryden,* 276 Minn. 55, 58, 148 N.W.2d 804, 807 (1967). Here the evidence of the reasonableness of the capitation rates in the contested case proceedings required different evidence from that presented in the arbitration proceedings.

■ 3. Park Nicollet claims the record does not support the Commissioner's finding that the capitation rates established by the arbitrators' order were unreasonably high in relation to the value of the services provided by Park Nicollet. This court has the authority to reverse an administrative order which is "[u]nsupported by substantial evidence in view of the entire record as submitted". Minn.Stat. § 14.69(e) (1988). "Substantial evidence" is defined as follows:

We view that by the "substantial evidence" test is meant: 1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than "some evidence"; 4) more than "any evidence"; and 5) evidence considered in its entirety. There are correlative rules or principles that must be recognized by a reviewing court, such as: 1) unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported; 2) a substantial judicial deference to the fact-finding processes of the administrative agency; and 3) the burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety.

*Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977).

The Commissioner found:

In 1987, [Park Nicollet] and [MedCenters] were exploring various ways of reducing costs. At that time, Neill Fishman, a [Park Nicollet] staff member, sent a memorandum * * * suggesting that a variety of protocols be instituted to place more emphasis on identifying non-necessary procedures within [Park Nicollet]. * * * In that memorandum, 17 procedures were examined. Fishman concluded that if the frequency of services that are sometimes medically non-necessary were reduced, [Park Nicollet] could save nearly $2 million annually. For the rest of the year, [Park Nicollet] and [MedCenters] unsuccessfully sought to implement these savings * * *.

The Commissioner adopted the ALJ's finding that a 12% excess bookings differential occurred with respect to MedCenters' patients, as compared with fee-for-service patients. She found the evidence established that

> unnecessary services have been provided to [MedCenters] members. Second, [Park Nicollet] has charged [MedCenters] more than fee-for-service patients are charged for certain procedures. * * * Finally, upward "creep" in physician charging practices has occurred as a result of the [Park Nicollet] compensation system.

She concluded that

> the capitations awarded by the arbitration panel are excessive in relation to the value of the services performed because the capitations were based, in part, on excessive bookings attributed to [MedCenters] members.

These findings are supported by evidence in the record. The fact that there is some evidence in the record to support Park Nicollet's arguments on appeal is not determinative. *See Reserve*, 256 N.W.2d at 825.

4. Finally, Park Nicollet claims the Commissioner erred by retroactively setting rates. We disagree. The Commissioner properly addressed the issue of retroactive rate-setting as follows:

> [T]he rejection of unreasonably high expenses does not constitute rate setting as that term is generally understood.

\* \* \* \* \* \*

\* \* \* The January 1988 Cease and Desist Order merely rolled [MedCenters]'s capitation rate back to 1987 levels in order to preserve the status quo and to ensure that [MedCenters] was paying some level of compensation to [Park Nicollet] while this contested case proceeded.

The final decision * * * effectively leaves [Park Nicollet] and [MedCenters] without a capitation rate for 1988. * * * [T]he decision does not impose [a] capitation rate on the parties. [Park Nicollet] and [MedCenters] will have to begin negotiations under their provider agreement to establish a reasonable rate for 1988.

### DECISION

The legislature has given the Commissioner the authority to determine whether an HMO's expenses are unreasonably high. It is our view that it was never the legislature's intention to permit a clinic and an HMO to agree and/or arbitrate certain rates to the exclusion of the Commissioner's authority in the field. In our opinion here, as the facts are presented, we must enforce the Commissioner's statutory authority to determine that on public policy grounds the 1988 capitation rates were unreasonable. We therefore affirm the Commissioner's order and decision on reconsideration prohibiting implementation of the arbitrators' decision.

Affirmed.